## ILLINOIS CENT. R. CO. v. RAILROAD COMMISSION OF KENTUCKY et al.

(District Court, E. D. Kentucky, June 30, 1923. On Further Hearing October 15, 1924.)

1. Commerce ⊶89 — Question of undue discrimination between interstate and intrastate rates one for Interstate Commerce Commission.

Whether an intrastate rate established by a state commission creates an undue discrimination against interstate rates is a question of which the courts have not jurisdiction, but one which, under the Transportation Act, must be determined by the Interstate Commerce Commission.

2. Carriers ⊶12(6½) — Evidence justifying reduction of rates by state commission.

A state commission cannot base a finding that existing rates of an interstate carrier are excessive, and an order reducing the same on intrastate shipments on schedules and other general information which it has in its files, unless they were introduced in evidence in the particular proceeding and opportunity was given the railroad company to be heard thereon.

3. Courts ⊶102(1) — Three judges may delegate to local judge issue of injunction, but will not decide motion to dismiss.

After a hearing before three judges under section 266, Judicial Code (Comp. St. § 1243), they may delegate to the local judge the issue of injunction after conditions are performed, but they will not decide a motion to dismiss the bill.

On Further Hearing.

4. Courts ⊶328(4) — Federal court held to have jurisdiction of suit to enjoin enforcement of order of state Railroad Commission.

A federal court is not without jurisdiction of a suit to enjoin enforcement of an order of a state Railroad Commission reducing rates on complaint of a shipper, because the difference between the two rates as to that one shipper may not amount to $3,000, where the aggregate difference on all shipments affected would equal that amount within a short time.

5. Carriers ⊶18(6) — Order of state Railroad Commission not based on evidence is not due process of law, and its enforcement may be enjoined.

Where the state statutes do not provide for a judicial review of orders of the state Railroad Commission, an order made without any substantial evidence on which to base it is arbitrary, and is not due process of law, and its enforcement may be enjoined by any court of equity of competent jurisdiction.

6. Carriers ⊶18(6) — State commission held to have jurisdiction to reconsider order enjoined.

Where an order of a state Railroad Commission was temporarily enjoined to enable the commission to reconsider it, the commission *held* to have jurisdiction to hold a further hearing.

7. Carriers ⊶12(7) — Factors which enter into comparison of rates.

That a rate established by a railroad company on sand and gravel between two points gives it a higher rate per ton mile than its average earnings on all commodities is not evidence that such rate is unreasonable or excessive, without taking into consideration the length of the haul, as compared with the average haul, and other essential factors which may affect the question.

8. Carriers ⊶12(7) — Order of state commission reducing rate held not based on any substantial competent evidence.

An order of a state Railroad Commission, reducing a rate established by a railroad company, *held* not supported by any substantial competent evidence.

In Equity. Suit by the Illinois Central Railroad Company against the Railroad Commission of Kentucky and others. On motion for preliminary injunction. Granted.

Trabue, Doolan, Helm & Helm, of Louisville, Ky., for Illinois Cent. R. Co.

Frank E. Daugherty, Atty. Gen., and O. S. Hogan, Asst. Atty. Gen., both of Frankfort, Ky., for Railroad Commission of Kentucky.

Before DENISON, Circuit Judge, and COCHRAN and SATER, District Judges, under section 266 of the Judicial Code.

PER CURIAM. Using approximately accurate figures, the rate on gravel and sand from Paducah to Hopkinsville had been 4 cents, and interstate rates were upon the same basis. By its order in Ex parte 74, July 29, 1920, the Interstate Commerce Commission directed an advance of 25 per cent. on all interstate rates in this territory. Thereupon the railroad, without the approval of the state commission (such approval being unnecessary), raised its interstate rates also in the same percentage. This rate became 5 cents. A shipper entered before the state commission a complaint against this rate as being excessive and unreasonable, the state commission had a hearing and took evidence,

and thereafter made a finding that the rate be set aside, because excessive, and be fixed at 4 cents. This suit was brought to enjoin the execution of this reduction. The motion for injunction now comes on to be heard upon the bill of complaint, certified copies of all the proceedings and all the evidence before the commission in the case brought by the shipper against the railroad, and the motion of the defendants to dismiss the bill.

[1] The first complaint against the commission's order is that it works undue discrimination against interstate commerce, and is therefore under the condemnation of the Transportation Act (Comp. St. Ann. Supp. 1923, § 10071¼ et seq.). The question whether interstate rates are discriminatory as between shippers is one of which the courts have now no jurisdiction. There must be a hearing on that subject before the Interstate Commerce Commission and a finding by it. Texas Co. v. Abilene Co., 204 U. S. 426, 440, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075. We see no reason for any different rule as to discrimination between interstate and intrastate rates. We think the Transportation Act contemplates that an intrastate rate should be condemned for this reason only after there has been such a hearing and such a finding, not only of discrimination, but of undue discrimination; and such has been the practice. Railroad Commission of Wisconsin v. Chicago Co., 257 U. S. 563, 42 Sup. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; United States v. Tennessee, 262 U. S. 318, 43 Sup. Ct. 583, 67 L. Ed. 999 (May 21, 1923). Ex parte 74 cannot take the place of such a hearing and finding; it neither pertains to intrastate rates nor to the conditions existing in July, 1922, when the order now in question was made.

Nor can any different result follow from the railroad's appeal to the rule of convenience arising from the fact (if it is a fact) that the state commission is reducing one rate at a time by separate orders, thus making necessary numerous separate applications to the Interstate Commerce Commission. It is not to be supposed that the state commission would continue this course, if the Interstate Commerce Commission should decide that in one typical instance it had been erroneous.

[2] The second complaint against the commission's order is that it was made without any evidence to support it. Since the entire record before the commission was put in evidence before us upon this motion, this contention is open to the railroad, as it was not in the first Siler Case (Louisville & N. R. Co. v. Garrett, 231 U. S. 298, 34 Sup. Ct. 48, 58 L. Ed. 229), but as it was in the second hearing in the same case (Louisville & N. R. Co. v. Finn, 235 U. S. 601, 35 Sup. Ct. 146, 59 L. Ed. 379).

We therefore must examine this record. There was considerable evidence comparing this rate with more or less similar rates upon this and other railroads in somewhat similar territory. The railroad claimed that none of this had any substantial tendency to support the complaint. We think it unnecessary for us to go into this question at this time. For the purposes of this motion we accept the opinion of the commission, and interpret it as a conclusion that none of the testimony before it, or which it considered, would have justified the result which it reached, save only the railroad's schedule of rates on the same materials from Cairo to points south on the main line.

The case is analogous to that considered in Florida, etc., Co. v. U. S., 234 U. S. 167, 185, 186, 34 Sup. Ct. 867, 58 L. Ed. 1267. "The inquiry narrows itself to the mere consideration of" the testimony which the commission selected as that upon which it planted its order, and the commission should be treated as justifying its conclusion only by comparison with those schedules. So far as the record shows, these were not put in evidence or in any way referred to at the hearing, and the railroad had no knowledge, until the opinion of the commission was filed, that these Cairo south-bound rates were claimed to have any bearing on the issue. The natural inference from the record is that these schedules were on file with the commission pursuant to the general provisions of the law, and that it thought itself entitled to resort to them and base its conclusion thereon, merely because it had knowledge of them in this way. It was decided in Interstate Commerce Com'n v. L. & N. R. Co., 227 U. S. 88, 93, 33 Sup. Ct. 185, 57 L. Ed. 431, that a commission cannot base a finding upon the schedules and other general information which it has in its files, unless they were put in evidence in the particular proceeding, and opportunity given to the railroad to meet and explain them. This same general rule was stated and applied in U. S. v. L. & N., 235 U. S. 314, at page 321, 35 Sup. Ct. 113, 59 L. Ed. 245, and the Florida, etc., Co. Case, supra, gives us an instance of the kind of proof that has superficial force, but is not considered substantial enough to support a commission's findings.

We must conclude that the order now attacked cannot stand; but the matter should

not be left in this plight, when perhaps there is no valid objection to the commission's order, excepting one that can be easily corrected. Our order will be that our restraining order, now in force, be continued for 90 days, or for such further time as the District Judge of this district may direct, within which time the commission may, by its order, reopen the case for suitable further hearing or hearings, and make a further finding; that if the time so limited expires without further finding, then the preliminary injunction will issue as prayed; and that, if there is a further finding upon further evidence, it will be the duty of the railroad promptly to bring the motion on for further hearing upon such additional showing.

[3] Since we think the requirements of section 266, Judicial Code (Comp. St. § 1243), have been met by the hearing which has been had, and by the filing of this memorandum approved by the three judges, the order presently continuing the restraining order as herein directed, and the preliminary injunction to issue if there is no further showing to be made, will be entered by the District Judge of this district, sitting alone. He will also pass upon the motion to dismiss the bill. The court as now constituted may consider the grounds of such a motion as they bear upon the motion for injunction, but can make no order, except to grant or refuse the injunction or restraining order.

### On Further Hearing.

PER CURIAM. In July, 1922, the Kentucky Railroad Commission, upon the application of the Forbes Manufacturing Company and Dalton Bros. Brick Company, made an order reducing to 4 cents the tariff rate of 5½ cents per 100 pounds of the Illinois Central commodity tariff on sand and gravel moving from Paducah, Ky., to Hopkinsville, Ky. Upon an application to us for a preliminary injunction, we thought that the commission's conclusion of extortion in the 5½-cent rate was essentially based upon a comparison with the Illinois Central rates from Cairo, Ill., to points intermediate Cairo and Jackson, Tenn., and that this comparison was erroneous because the tariff schedule containing these rates had not been put in evidence and the railroad had not been given opportunity to be heard thereon. We continued the preliminary injunction, but directed that further proceedings might be had before the commission, and that, if they were had and upon fur-

ther evidence the order was re-entered, a new motion for injunction would be entertained upon the record as it might then be. Further proofs were had; the commission made a further finding or opinion, and re-entered the same order. At the same time it heard a similar application from the Princeton Lumber Company against the rate on sand and gravel from Paducah, Ky., to Princeton, Ky., and made an order that the then 4-cent rate was unreasonable, and reduced the rate to 3 cents. In this matter, also, the railroad filed a bill and moved before us for a preliminary injunction. The issues in the two matters are substantially the same.

[4] It is first objected by the commission that the court has no jurisdiction, because it is not clear that more than $3,000 is involved. This objection must be overruled. It is true that no reparation which has been ordered by the commission to any one shipper equals $3,000; it may even be assumed that there is no sufficient basis for a conclusion that the difference between the two rates as to any one shipper will, within any reasonable time, reach the aggregate of $3,000; but this suit is not between the railroad and any one shipper. In either the Hopkinsville or Princeton case, the commission represents all shippers and consignees at that point, present and prospective. During a period of two years the excess for two consignees in Hopkinsville was nearly $2,000. The bill alleges that the amount in controversy is more than $3,000, and this seems to be a reasonable inference from the fact that even as to the two shippers the amount has already accumulated so far. Similar considerations apply to the Princeton rate. This is not all. The bills allege irreparable injury, both in that the cutting of this rate disorganizes the whole rate structure and in that the railroad officials are subject to excessive penalties for not obeying the order, and have no way of escape by getting the question litigated excepting by this suit. Under familiar and settled principles we think the jurisdiction sufficiently appears.

[5] Defendants next urge that there must be an application to the Interstate Commerce Commission before these bills could be entertained. So far as this objection goes to the plaintiff's claim that the new state rate is, for the future, a discrimination against interstate commerce, we adhere to our previous opinion, and think that the objection is good; but this view does not apply to that aspect of the suit which seeks

an injunction because the new rate has been made without due process of law. Since the state statute does not provide for any judicial review, an order made by the commission, without any substantial evidence upon which to base it, is arbitrary, is not due process of law, and calls upon any court of competent jurisdiction to enjoin its execution. In a proper case the court will proceed upon this ground; and since all the evidence that was before the commission is exhibited to us, the question is here open. These propositions, too, are well settled.

[6] Plaintiff's first claim is that the commission had lost jurisdiction of the Hopkinsville case, because it had made one final order, which had been enjoined. It was our purpose in the former injunction order to avoid any such result, and we conclude that the commission had jurisdiction to hold the further hearing.

We come, then, to the meritorious question, whether there was any legal and substantial evidence upon which to base the conclusions that the 5½-cent rate and the 4-cent rate were respectively unreasonable, or, in the language of the Kentucky statute, "extortionate." [1] It appears that the commodity tariff for sand and gravel is based substantially upon a mileage scale. It is 3½ cents for 25 miles or less, increasing one-half cent for each additional 25 miles or fraction thereof, up to a point past the distances here involved. From Paducah to Hopkinsville is 77 miles, and the rate is 5 cents.[2] It appears without dispute that this mileage scale has been the basis of the rates throughout Kentucky, and, indeed, the remainder of the Illinois Central system, and that all its rates for this commodity are made upon that basis, excepting the instances to be mentioned. Indeed, upon the first hearing the commission found that the "mileage scale of rates in other sections of Kentucky and the Southeast are fairly comparable with the rates on sand and gravel from Paducah to Hopkinsville."

[7] It is easily conceivable that such a mileage scale might be attacked as unreasonable because it did not fairly compare with the usual rates on other commodities of like bulk and value, or because it led to unreasonably large car-mile or ton-mile earnings, or for some similar general reason; but this record discloses only one question of this kind. It was made to appear that the railroad's average earning in 1923 on all commodities was 7.77 mills per ton mile; that the Paducah-Hopkinsville 5½-cent rate gave about 14 mills; and it is then said that, since gravel and sand are in the lowest grade of commodities, any rate for them which is above the average must be unreasonable. Hence a rate of about 10 mills, yielding 4 cents per 100 pounds was fixed. This conclusion is a non sequitur, unless after consideration of many elements not in proof here. The 7.77 average earning was for an average haul of 280 miles; the Paducah-Hopkinsville haul was about one-quarter as long; all concede that the ton-mile rate should be higher on a short haul, but how much higher there is no proof. The subject-matter here involved is really the whole mileage scale. It is divided into brackets so small—25 miles—that each may well be judged by its maximum. The first one—25 miles—shows ton-mile earnings of 28 mills; but this includes both terminals, and there is no evidence that it is too high. Each subsequent bracket adds to the tariff at the rate of 4 mills per ton mile; thus 50 miles shows 16 mills, 100 miles 10 mills, 200 miles 7 mills, etc.[3] Indeed, this very mileage scale basis carried out to the average haul of 280 miles will give about 6 mills.

Further a great part of the total commodity traffic is over easy grades or level country; this particular haul may be relatively difficult; there is no proof, excepting such as has the latter tendency. Still further, nearly half of the commodity traffic is on coal with a long haul, producing a low rate; the sand and gravel traffic is relatively small and short haul. Obviously, ton-mile earnings above the average cannot merely for that reason be cut down; the average is thereby automatically reduced, and the process would be endless. We do not question that a proper and complete comparison of ton-mile earnings is an element to be considered in reducing a rate, and it is conceivable that it might of itself, in some cases, be substantial evidence supporting reduction; but upon this record there are no sufficient data for an intelligent conclusion. We think the precedents set by the Interstate Commerce Commission

---

[1] In its second opinion the commission said that its conclusion rested upon all the evidence; it is therefore necessary to examine each item supposed to give support.

[2] These are the figures after a general voluntary reduction July 1, 1922. The commission was considering a previous tariff one-half cent higher to Hopkinsville. The difference is not vital to any conclusions now reached.

[3] 25-mile—3½ cents per 100 pounds, equals 70 cents per ton, equals 28 mills per ton mile.
50-mile—4 cents per 100 pounds, equals 80 cents per ton, equals 16 mills per ton mile.
100-mile—5 cents per 100 pounds, equals 100 cents per ton, equals 10 mills per ton mile, etc.

do not justify substantial dependence upon a mere ton-mile rate comparison on such a record as this. We feel compelled to hold that, so far as this item of evidence is concerned, it furnishes no legal support to the order for reduction.

[8] This leaves nothing except the comparisons with other commodity rates; and since there are several of those, they must have detailed attention. It is not very clear that the mere existence and use of, for example, a single 3-cent rate for a 100-mile haul would be substantial evidence that a 5-cent rate for another 100-mile haul was unreasonably high. It is possible, if not equally probable, that the 3-cent rate is unreasonably low. If it is such substantial evidence, it is because of the supposition that no rate would be voluntarily made unless reasonably remunerative, and because of the admission thus implied. See L. & N. R. R. v. U. S., 238 U. S. 111, 35 Sup. Ct. 696, 59 L. Ed. 1177; Skinner v. U. S., 249 U. S. 557, 565, 39 Sup. Ct. 375, 63 L. Ed. 772. This primary question may be passed by, and our attention given to the railroad's claim that these instances of rates, really or apparently lower than the prevailing mileage scale, are so exceptional and so far the result of other circumstances than the normal and voluntary action of the railroad, that they carry no proper inference of inherent reasonableness.

We notice, first, the group of rates which were relied upon in the former order and referred to in our former opinion. We take, as an example, the same one which the commission did—the rate from Cairo, Ill., to Medina, Tenn. This was selected because the distance was 91 miles, and in the same mileage bracket as the 77 miles from Paducah to Hopkinsville. This rate was then 5½ cents. The commission found that it must be taken to include the charge for crossing the Cairo bridge, and that, by the defendants' tariff, rates from the South to Cairo, Ill., were made by adding 2 cents to the rate to the Kentucky side of the Ohio river. It therefore deducted 2 cents from the 5½-cent rate, and assumed that plaintiff was maintaining and using a 3½-cent rate from East Cairo, Ky., to Medina, Tenn. If this 3½-cent rate were unexplained, we assume that it might support the commission's conclusion. However, it appears, also without dispute, that in 1916 the complainant's mileage scale rate, plus the bridge differential, from Cairo to Medina, was 5½ cents, and to Jackson, Tenn., 6 cents; that at that time the Mobile & Ohio, a competitive line, from Cairo to Jackson, made a rate of 3¼ cents; that the Illinois Central was then compelled to, and did, reduce its rate to Jackson to the same figure, 3¼ cents, and, in order not to violate the Kentucky long and short haul statute, it was compelled to reduce to the same figure its rate to points intermediate Cairo and Jackson, among which is the group now involved, including Medina; that with the flat increases of 1918 and 1920 this rate became 5½ cents for Jackson and the Medina group; that when the Cairo-Jackson Mobile & Ohio rate was raised, the Cairo-Jackson Illinois Central rate was put back on the mileage scale and made 9 cents, effective April, 1922; that through oversight, and because they were in a separate tariff and were only paper rates, and no traffic whatever has moved or has since upon them, the Medina and similar rates were untouched; and that, now that attention has been drawn to them, they are in process of revision. These things, being undisputed, must be taken as conceded facts, and we are satisfied that they leave no force whatever in this Medina group of rates as a basis of comparison, and that the commission's order finds no legal support in that evidence. Other rates may be persuasive of reasonableness, even if they were originally forced by competition, if they are retained after the competition ceases, but not so, it would seem, if they are unused, if no attention is given to them, and if their retention is inadvertent.

Attention is next called to the Illinois Central Railroad sand tariff from Paducah to Central City, 99 miles, at the rate of about 4½ cents per 100 pounds, another from Paducah to Dawson Springs, 61 miles, at 3¾ cents, and others from Gravel Switch to various places at 5 cents up to 175 miles. These are the only three instances, aside from the Medina case, which have been found on the whole system (north of Mississippi) where there is a sand and gravel rate less than the Kentucky mileage scale. Each of these three instances was originally a special rate made to meet some current necessity. The Central City rate (now canceled) was made by the gross ton. The railroad witness had never before observed any sand and gravel rate on the whole system so made. We are satisfied that this was made many years ago, to meet the demand for material on some public improvement. The same is true as to the Dawson Springs rate, excepting that it was, like the others, made by the net ton, and is said to have been retained of late under compulsion by the commission. A specially low rate for public improvement is sanctioned both by

the Interstate Commerce Act (Comp. St. § 8563 et seq.) and by many state laws. There is no proof that of late years anything has moved on the Central City rates. These two are plainly out of line with the rate structure, and must have originated in some such way as the witness thought.

The history of the Gravel Switch rates is not known to the present tariff man, but the material there found is suitable only for road building, public work, and hence the rate may rightly be less than the regular mileage scale. The character of local material may practically limit the application of a tariff, just as effectually as if the limitation were in the published tariff. Further, the Gravel Switch sand is worth much less than that hauled from Paducah, which is river sand, suitable for plastering and stucco work. We do not regard these three instances, separately or together, when thus explained, as amounting to substantial proof that the regular mileage scale is extortionate.

It is shown that the Illinois Central Railroad Louisiana-Mississippi mileage scales run between 4 and 5 cents for distances comparable to 77 miles; but these are in a different character of country. They have been forced by the state commissions against protest, and they are in litigation. On the contrary, a higher mileage scale is in use north of the Ohio river, although it is an accepted general principle that the territory south of the river justifies a higher rate in comparison with that north.[4]

Two Illinois Central Railroad special rates on crushed stone and one group of rates on clay and one special rate on molding sand are shown to be less than the sand and gravel mileage scale. The crushed stone rate from Hopkinsville to Evansville is only slightly less than sand scale. It was specially put in to meet some rate offered by the Louisville & Nashville Railroad on a shorter line and to enable the stone quarry at Hopkinsville to get some Evansville business. It is not as low as the Louisville & Nashville rate, and stone has not moved under it, but it has been allowed to remain without attention. The special rate from Cerulean to Henderson on crushed stone

was made under similar circumstances for a similar purpose and has a similar history. The rates on clay are not commented on by any witness, as far as we find, on either side. The map indicates competition. Upon this record they are not properly comparable. The molding sand rate in Alabama was specially made to meet competition of other roads running into Birmingham, and in order to move a material that otherwise would have no market. These four rates likewise, separately or as a group, have no substantial evidential force as to the reasonableness of the mileage scale.

Four Louisville & Nashville special rates on sand or stone are shown to be somewhat under the Illinois Central sand and gravel scale. The circumstances attending them do not appear. They are plainly exceptions to the Louisville & Nashville generally prevailing commodity rates. We see no evidential force in them, upon the present issue.

A specific and well-explained coal rate from Nortonville and Dawson Springs to Hopkinsville on the Illinois Central (to meet a competing short line rate), a rate on sand in Nebraska and on ice in Michigan, and some well-explained sand rates on another railroad in Alabama, all are too remote to call for serious attention.

The fact that Hopkinsville takes considerable shipments is mentioned by the commission. Its population is 12,000. We see no basis for compelling the railroad to give it preferential treatment.

It is also said that the lower ton-mile rates to Dawson Springs necessarily demonstrate as against Hopkinsville the "discrimination" of section 817, Ky. Stats., and the "unreasonable advantage" of section 818. We cannot think that a rate originally made as a special rate for a special reason, and the recent maintenance of which has been compelled by the commission, is a proper standard of comparison, even if the existence of the lower rate would justify abolishing the one which is higher, though still reasonable.

The Princeton case involves substantially the same questions, and is governed by the same principles discussed in the Hopkinsville case. It was heard upon the same record, with immaterial exceptions or additions. The only additional point involved is that before July, 1922, the net ton rate from Paducah to Princeton was 90 cents, from Paducah to Dawson Springs 75 cents, and from Paducah to Central City about 90 cents. These points are upon the same line, and are respectively 46, 61, and 98 miles from Paducah. It is said that the

---

4 The Interstate Commerce Commission (In re Sand & Gravel, etc., 81 Interst. Com. Com'n R. 295, 297) considered an effort to raise a (short line mileage) 22-mile rate above 83 cents. The existing rate was not disturbed. The Michigan general mileage scale rate for 25 miles was found to be 68 cents, and for 60 miles 86 cents. The average mileage rate in Illinois is found to be 80.9 cents for 25 miles, and 88.8 for 60 miles. Compare with the Illinois Central Kentucky scale, 70 cents for 25 miles, and 90 cents for 75 miles.

long and short haul clause (section 820, Ky. Stat.) forbids charging a higher rate to Princeton than to either of the other places. In answer, it is said that the special circumstances attending the making of these two rates exempt them from the "under substantially similar circumstances and conditions" of section 820. However that may be, and whether or not the section authorizes reducing the higher rate to the lower, without resorting also to the "discrimination" or unreasonable preference of sections 817–819, the commission's order cannot be thus justified. The 3-cent rate prescribed for Princeton was less than that to either of the other places.

This completes the catalogue. Sometimes the persuasive effect of evidence from many items may be greater than the sum total of the separate effects, but not so here. The mileage scale may be too high, although it is no higher than those in general use by all the other Kentucky railroads; whether it is too high we have no opinion; but, if so, it must be shown by something more than the mere color of evidence which we have here. The burden of showing the rate to be unreasonable is upon the commission. The "indisputable nature of the evidence" (Louisville & N. R. Co. v. United States, 245 U. S. 466, 38 Sup. Ct. 141, 62 L. Ed. 400) is to the contrary, and the injunction must issue. On former hearings, and lest the then insuperable objection to the order might prove to be only technical, we preserved the matter for future hearing before the commission. There is no occasion to do so further. The merits have been fully considered. Those attacking the rate had a year in which to meet the challenge made by the railroad's proof on the first hearing. Any further proceedings before the commission must be solely by authority of the Kentucky Statutes.

Under the Clayton Act (38 Stat. 730), plaintiff should give a bond as a condition of having a preliminary injunction. The amount and terms can be settled by the judge of the district.