## UNITED FUEL GAS CO. et al. v. RAILROAD COMMISSION OF KENTUCKY et al.

(District Court, E. D. Kentucky. April 22, 1925.)

No. 3436.

1. **Gas** ⬤═14(1).

Natural gas company has right to hold reserve and undeveloped acreage, which must be considered in determining rate base.

2. **Gas** ⬤═14(1).

Reproduction cost new, and overhead expenses during construction as part of such costs, may be included, as affecting rate base of natural gas company.

3. **Courts** ⬤═263.

Federal court, having taken jurisdiction of rate base case to determine whether rates are confiscatory, in violation of Const. U. S. Amend. 14, *held* to have jurisdiction to deter-

mine whether Acts Ky. 1920, c. 61, placing natural gas companies under supervision of state railroad commission, is violative of Const. Ky. § 51.

**4. Courts ⚖═262(2).**

A complainant, to invoke jurisdiction of federal court as court of equity, must have suffered injury to a property right and be without an adequate remedy at law.

**5. Constitutional law ⚖═46(2).**

To authorize relief on ground that ratemaking procedure under state statute violates due process clause of Fourteenth Amendment, complaint must show deprivation or confiscation of property rights.

**6. Courts ⚖═284.**

Claim that state regulatory statute violates state Constitution is not ground for invoking jurisdiction of federal court in rate base case.

**7. Gas ⚖═14(1).**

Rates insufficient to yield reasonable return on property used, when used, are confiscatory, and their enforcement will be enjoined, as in violation of Const. U. S. Amend. 14.

**8. Gas ⚖═14(1).**

Reproduction value is dominant element to be considered in determining value of natural gas company's property for rate base purposes.

**9. Gas ⚖═14(1).**

For rate base purposes, gas acreage belonging to natural gas company should be valued at its book value, rather than on basis of its earning capacity.

**10. Gas ⚖═14(1).**

Natural gas company is entitled to charge rates which will refund its entire capital investment within life of business.

**11. Mines and minerals ⚖═47.**

Oil and unrecovered gas in ground are not subject of ownership until recovered, or, if so, are property of owner of fee, rather than mining lessee.

**12. Gas ⚖═14(1).**

Charge for interest on capital during construction is proper in determining rate base for natural gas company.

**13. Gas ⚖═14(1).**

In determining rate of interest on capital during construction, chargeable in determining rate base for natural gas company, nature of business and its speculative features should be considered.

**14. Gas ⚖═14(1).**

Seven per cent. interest on capital during construction *held* proper charge in determining rate base for natural gas company, whose properties are proved and producing.

**15. Evidence ⚖═22(2).**

It is common knowledge that large public utilities usually secure services of underwriting syndicate to market their securities.

**16. Gas ⚖═14(1).**

A charge for "cost of financing" *held* improper, except as part of "going concern" value, in determining rate base for natural gas company.

**17. Evidence ⚖═22(2).**

It is common knowledge that large operating corporation and syndicate managers maintain at their own expenses estimating and valuing departments, as affects right of public utility to make charge for "cost of financing" in determining rate base.

**18. Gas ⚖═14(1).**

"Going concern" value of natural gas plant, as affecting rate base, cannot properly include mere good will, predicated on earning capacity.

**19. Gas ⚖═14(1).**

Depletion of natural gas company's properties for rate base purposes must be calculated by straight-line, age-life, method, and on investment value to be returned in full.

**20. Gas ⚖═14(1).**

In estimating depreciation or deterioration from use of physical plant of natural gas company for rate base purposes, the "observed deterioration" method should be used.

**21. Gas ⚖═14(1).**

In determining rate base for natural gas company, production expenses and valuation, general property valuation, general expenses, and working capital should be apportioned between different localities served on proportionate sales basis.

**22. Gas ⚖═14(1).**

In determining rate base for natural gas company, transmission system, valuation, and expenses should be apportioned between localities served on the demand mileage basis.

**23. Gas ⚖═14(1).**

In determining rate base for natural gas company, distribution cost should be apportioned between localities served, on basis of actual valuation of distributing plants and expenses incurred in the several localities.

**24. Gas ⚖═14(1).**

Natural gas company *held* chargeable with one-half of net earnings of its gasoline extraction department in determining rate base.

**25. Gas ⚖═14(1).**

Annual depreciation, maintenance, and repair charges, as distinguished from reserve for depletion, should be allowed in determining rate base for natural gas company.

**26. Gas ⚖═14(1).**

Six per cent. charge on entire property or rate base of natural gas company *held* sufficient to provide for both depletion and depreciation including maintenance and repair charges.

**27. Gas ☞14(1).**

Depreciation charge, in determining rate base for natural gas company, must be figured on appraised value, rather than investment cost.

**28. Gas ☞14(1).**

Rate for natural gas company allowing a return of 16 per cent. on rate base, to cover interest on investment, profits, depreciation, and depletion, *held* not confiscatory.

**29. Gas ☞14(1).**

In rate base case, court is not required to fix rate, but solely to determine whether rate fixed is confiscatory.

**30. Gas ☞14(1).**

Amount of discount allowable to insure prompt payment of bills is matter within discretion of gas company, which cannot be regulated by commission, under Acts Ky. 1920, c. 61.

**31. Gas ☞14(1).**

Burden of showing that rates are confiscatory is on complaining utility.

**32. Gas ☞14(1).**

Rates fixed by state commission will not be held confiscatory, unless evidence clearly compels conviction that fair-minded board would not have found them adequate.

**33. Gas ☞14(1).**

Public utility has common-law duty to serve all who apply.

**34. Gas ☞14(1).**

Natural gas company, though possessed of right to withdraw from state, has no right to withdraw from business in particular cities only merely because dissatisfied with rate allowed.

**35. Equity ☞39(1).**

Court, having assumed jurisdiction of suit to enjoin enforcement of order affecting gas company rates, will retain it to do complete justice between parties.

**36. Corporations ☞642(1).**

Equity will look through mere fiction of corporate entity to fact that parent corporation is doing business in state of its subsidiary's domicile.

**37. Gas ☞14(1).**

That gas company's franchises in various cities have expired does not make continuance of business illegal, enterprise being state, and not municipal, venture, under Acts Ky. 1920, c. 61, § 23.

**38. Constitutional law ☞278(1).**

That public service duty requires expenditure of capital for supplying facilities does not constitute taking of property without due process.

In Equity. Action by the United Fuel Gas Company and another against the Railroad Commission of Kentucky and others. Decree in accordance with opinion, granting part only of relief sought.

S. S. Willis, of Ashland, Ky., and Harold A. Ritz, of Charleston, W. Va., for plaintiffs.

Frank E. Daugherty, Atty. Gen., and Overton S. Hogan, Asst. Atty. Gen., of Kentucky, and John T. Diederich and Vernon A. Dinkle, both of Ashland, Ky., for defendants.

HICKENLOOPER, District Judge (for the Southern District of Ohio, sitting by designation in the Eastern District of Kentucky). This is an action brought by the United Fuel Gas Company and the Warfield Natural Gas Company, both corporations, created, respectively, under the laws of West Virginia and Kentucky, to enjoin an order of the Railroad Commission of Kentucky fixing the rates at which natural gas shall be sold in the municipalities of Ashland, Catlettsburg, and Louisa, all in Kentucky. Before discussing the several points raised by counsel, it might be of interest and assistance to observe the relationship of the interested parties at the time of the order in question, and the proceedings and events prior to the making of that order. The filing of the bill in the instant case marks the culmination of one branch of a widely extended series of attempts on behalf of the complainant United Fuel Gas Company to secure increases in the rates for natural gas in Kentucky, Ohio, and West Virginia.

The complainant United Fuel Gas Company was organized on March 2, 1903, and was reorganized and obtained its principal gas-producing territory in 1909, when the properties of the United States Natural Gas Company were acquired. At the present time the capital stock of the United Fuel Gas Company is owned in substantially equal amounts by the Ohio Fuel Supply Company and the Columbia Gas & Electric Company, hereinafter called the parent companies. Additional gas acreage was secured on June 30, 1910, from the Hope Natural Gas Company, and since that date additional leases have been continuously acquired, and large numbers of old leases renewed or abandoned, from time to time. On December 31, 1923, the company controlled 68,900 acres of operated gas-producing property, and likewise possessed leases giving them the right to explore for and extract natural gas in a reserve territory of 746,010 acres. Only a very small portion of either acreage was owned in fee simple, the great bulk being held under the so-called leases giving simply

the right to explore for and extract gas and oil. The books of the company have been kept so as to show in the minutest detail the cost of securing such acreage from time to time and the book value thereof. Bonus payments, the cost of securing new leases, the cost of renewals, and other charges necessary for the retention of the unoperated or reserve acreage, and all royalties paid upon leases in the operated area, have been properly charged to expense from year to year. The present book value of operated and reserve acreage is $6,732,920, although the probable cash consideration expended in securing such acreage was not in excess of half this sum. The new reserve acreage, which has been acquired continuously from time to time since 1910, to and including 1923, was so procured at costs ranging from as low as 8 cents per acre in Kentucky fields to 83 cents per acre between 1921 and 1923 in the West Virginia field. Over this period the average cost for obtaining new leases for reserve acreage was 34 cents per acre.

Commencing in 1910, the expansion of the field of operation of the United Fuel Gas Company was very marked. This company constructed and operated a natural gas transportation system, by which gas was taken from the West Virginia and Kentucky fields into and through Kentucky, and by its system, or that of its allied corporations, ultimately found its way to points as far distant as Louisville, Ky., and Cincinnati, Ohio. Passing through the municipalities of Ashland, Catlettsburg, and Louisa, Ky., the United Fuel Gas Company installed distribution systems, and for a period operated under franchises from these municipalities, which franchises, however, have now expired.

By the Act of March 22, 1920 (Acts 1920, c. 61), the Legislature of Kentucky undertook to place natural gas companies under the regulatory supervision of the Railroad Commission of Kentucky. Among the powers given to the Railroad Commission by this act is "the power to issue an order fixing just and reasonable rates to be charged for service," upon finding by the commission that rates, classifications, and charges in force by such company were extortionate. This act also provides, in section 23, that, "if the franchise of any public service company embraced in this act shall have expired, and the service is continued without obtaining a new franchise the said public service company shall be subject to the jurisdiction and authority of the Railroad Commission, and shall not withdraw its serv-

13 F.(2d)—33

ice from any municipality, county or community without first obtaining the permission of the said Railroad Commission so long as it remains in business in this commonwealth, or any part thereof."

This act is claimed to be unconstitutional under section 51 of the Kentucky Constitution, which provides that "no law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title, and no law shall be revised, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revised, amended, extended or conferred, shall be re-enacted and published at length." It is claimed that the enactment here involved relates to more than one subject, and that in so far as regulation of public utilities is concerned, and their duties and obligations prescribed, the act pertains to a subject-matter which is not expressed in its title.

On January 18, 1922, in the matter of a complaint lodged with the Railroad Commission that the then existing rates in the cities of Ashland, Catlettsburg, and Louisa were extortionate, the commission issued its order, after hearing, reducing rates to 80 per cent. of the then existing rates, such order to be effective on February 11, 1922. The then existing rates were 40 cents per 1,000 cubic feet, with a reduction of 5 cents per 1,000 if bills were paid within the discount period. The company interpreted this order to prescribe a maximum rate of 80 per cent. of the then existing 40-cent maximum, with the privilege of allowing such discount as the company pleased, in order to insure prompt payment. The company thereupon established a maximum rate of 32 cents per 1,000 cubic feet, with a discount of 1 cent per 1,000 if bills were paid within the discount period established. The order of the commission made no provision as to the amount of discount or the length of the discount period. This interpretation of the company was communicated to the commission, and the commission acquiesced therein until the making of its order of December 11, 1923, to be presently noted.

In the interim between the orders of January 18, 1922, and December 11, 1923, the United Fuel Gas Company, becoming dissatisfied with the rates, created the complainant Warfield Natural Gas Company, a Kentucky corporation, and conveyed to this company all that portion of the properties of the United Fuel Gas Company which were located in Kentucky, upon the assumption by

the Warfield Natural Gas Company of certain bonded indebtedness. The entire capital stock of the Warfield Natural Gas Company, exclusive of directors' qualifying shares, is owned by the United Fuel Gas Company. A contract was then entered into between the United Fuel Gas Company and the Warfield Natural Gas Company for the sale by the former to the latter of natural gas at the Kentucky state line for 30 cents per 1,000 cubic feet, there delivered and measured. In the case of the Columbia Gas & Electric Company and the Ohio Fuel Supply Company, parent companies of the United Fuel Gas Company, natural gas is wholesaled at much less than the cost of production; the United Fuel Gas Company taking the position that, inasmuch as its entire capital stock is owned by the other two companies in practically equal proportions, the price fixed for sales to such parent companies made no ultimate or substantial difference. But in the case of the Warfield Natural Gas Company the sale purports to have been made by the parent company, owning all the capital stock of the subsidiary, to the subsidiary company, and the quite apparent purpose of such a contract was the creation of a plausible basis for an application to increase rates. Because of the intercorporate relationship of the companies, and the manifest purpose in creating the Warfield Natural Gas Company and executing the contract just mentioned, no reliance is placed by the complainants upon this contract between the United Fuel Gas Company and the Warfield Natural Gas Company, although the price is claimed to be reasonable; nor is it claimed that sales to the Columbia Gas & Electric Company or the Ohio Fuel Supply Company should be considered as sales in a competitive market, or as returning only the price paid. In other words, it is conceded that, as to the several parent companies and this subsidiary company, the gas may be considered as sold at whatever price may be determined to be reasonable, and the contracts and sales between such parent and subsidiary companies are to be disregarded in determining the reasonableness of the charges. As regards the complainants herein, the Warfield Natural Gas Company is to be considered the instrumentality of the United Fuel Gas Company, and the combined properties are to be regarded as a unit in determining the rate base.

Shortly after the creation of the Warfield Natural Gas Company, that company filed a petition with the Railroad Commission of Kentucky, praying the vacation of the order of January 18, 1922, and the approval of a new gross rate of 45 cents per 1,000 cubic feet of gas, with 5 cents per 1,000 discount for prompt payment. The municipalities intervened and protested and the commission heard the case upon the evidence of both parties, as shown by Exhibit E attached to the bill of complaint. The decision of the commission is set forth in Exhibit D to the bill of complaint. An order was entered thereon, on December 11, 1923, rejecting the proposed rates, re-establishing the rate of 32 cents maximum charge, but providing for a discount of 4 cents for prompt payment, making a net rate of 28 cents per 1,000 cubic feet. No discount period was prescribed, however, and the companies were denied the right to withdraw the service.

Both hearings before the commission were upon elaborate evidence and the analysis and testimony of experts. The entire records of both hearings were, by stipulation of counsel, offered as evidence in the hearing of the application for interlocutory injunction, and have since been supplemented by additional evidence upon questions of valuation and earnings. The books of the companies have been accurately kept to the minutest detail, and afford a wholly reliable source of information as to all matters here involved. This evidence is complete for the year ending December 31, 1923, although not entirely satisfactory as to the fiscal year ending December 31, 1924. We shall accordingly treat generally only with the evidence of values and operations for the year 1923.

A large quantity of gas is also purchased by the United Fuel Gas Company from other companies at field mains, at prices averaging 4.68 cents per 1,000 for the year 1921 and 7.97 cents per 1,000 for gas purchased upon contracts since December 31, 1921. The gas so purchased constitutes approximately 20 per cent. of all gas sold by the United Fuel Gas Company and its subsidiaries. For the year ending December 31, 1922, total sales amounted to 47,625,222 M cubic feet, while 9,904,135 M cubic feet of this was purchased. In the year 1923 these respective figures were 47,040,235 and 9,669,753.

As we shall see, the real dispute is founded upon the valuation of the gas acreage; the company claiming a valuation of operated and reserve acreage, exclusive of the physical plant located thereon, of in ex-

cess of $30,000,000. The court has at its disposal the most minutely detailed inventories and appraisals of physical property. From an analysis of these inventories, the physical property used in production, other than acreage, is valued at $7,830,400. To the value so found the complainants' witness Uebelacker adds an estimated value of the acreage of $36,449,176. This sum is arrived at by estimating the amount of gas now in the ground which may be recovered, and valuing it at a price of 5 cents per thousand cubic feet. The witnesses Davis and Gregory, for the complainants, base their estimates of the value of this acreage, respectively $32,459,129 and $30,000,000, upon the exchange value of such acreage; Mr. Davis frankly admitting that, in arriving at his valuation, "the value of a property capable of producing natural gas is conceived to be measured by the prospective earning power of the property placed at its most advantageous use." Other witnesses for the complainants found their estimates of value upon the same basis.

The complainant thus claims the right to either value this acreage upon its exchange value, or upon a value placed upon the gas in the ground, both as affected by possibility of recovery and profitable sale; and the cities contend that in the case of such acreage the evidence does not disclose reliable valuation in excess of the cost. In the evidence produced at the hearing upon the question of interlocutory injunction, the complainant valued such acreage at $32,054,-600, as an exchange value which was created by reason of earning capacity. As has been stated, the book value of this acreage, as of December 31, 1923, was $6,732,920. There is now held in both productive and reserve acreage a total of 814,810 acres, and the average cost of securing reserve acreage is much less than 50 cents per acre.

Using this exchange value of acreage as the basis for the computations, the companies arrive at a valuation of the entire property, including production, transmission, and distribution systems, general property, overhead charges, and working capital, of $66,-070,496 (Uebelacker); whereas the book cost was approximately $27,000,000, and the estimated historical reproduction cost is fixed by the same witness at $32,813,708. The protesting cities insist that such present fair valuation does not exceed $30,000,000. The difference is approximately the difference between the valuation of the gas acreage upon the exchange value or earning ca-

pacity and the valuation of the same acreage upon the book value or cost. This question of valuation of acreage is controlling, and must be met in the determination of the issues of this case.

[1] We think that it must be conceded that the company has a right to hold, as used and useful in its business, reserve or undeveloped gas acreage, in which to prospect for gas. Much of this may prove unprofitable, but it is necessary for the continuance of the life of the business.

[2] It is conceded by the protesting cities, also, that, in estimating the reproduction cost new, overhead expenses during construction may be included as part of such cost. The company urges the adoption of a table of such overhead charges ranging from $21\frac{1}{2}$ per cent. to 26 per cent. in the aggregate. The cities contend that such charges should not exceed 18 per cent. in the aggregate, and this difference is made up of the contention of the cities that 7 per cent. is a sufficient rate of interest to be allowed on capital during construction, instead of 8 per cent., as urged by the company, and that there is no justification of the companies' charge of 4 per cent. on all classes of property for cost of financing. This item, the cities insist, is one of discount in the sale of securities, and should be entirely eliminated from the capital account.

An issue is also sharply drawn as to the method of computing depreciation or deterioration of property by time and use. The company has attempted to examine such property, and to deduct from each item, in estimating reproduction cost, the deterioration which was actually observed. The cities, on the other hand, insist that, in view of the admittedly limited life of a natural gas property, here estimated to be approximately 18 years, and in view of the right of the company to reimbursement to the extent of the value of its property, which will then be lost, or not recoverable, the only practical and logical method of computing depreciation is by the flat rate method. In other words, the issue is here drawn between the application of either the observed depreciation method or the straight-line, age-life, method.

Another issue as to valuation involved concerns the allowance of a going concern value which is estimated by the complainants' principal witness, Mr. Uebelacker, at $8,423,111, and is conceded by Mr. Hagenah, witness for the cities, at $3,000,000.

The last issue, which is seriously contested, is as to the right to reduce operating ex-

penses, or increase gas earnings, by a percentage of the profits from gasoline extraction from the natural gas. The companies also urge, although not with vigor, their right to withdraw from supplying the cities in question while still continuing their other business within the commonwealth.

The above make up the issues in the case. While the main question is, of course, whether the rates fixed are confiscatory, the subordinate questions, upon which this main issue must be determined, may be tabulated as follows: .

Constitutionality of Act Creating Railroad Commission.

Valuation Questions.
  (a) Gas acreage.
  (b) Physical plant.
    (1) Overheads—Interest on capital during construction.
    (2) Overheads—Cost of financing.
    (3) Going concern value.

Operating Accounting Questions.
  (a) Apportionment of rate base to various localities.
  (b) Sales to parent companies.
  (c) Application gasoline earnings.
  (d) Depletion, depreciation, and maintenance.

Reasonableness of Rate Fixed.

Right to Withdraw Service.

Constitutionality of the Act of March 22, 1920.

[3] While the question of the constitutionality of the act of the Kentucky Legislature of March 22, 1920, giving the Railroad Commission jurisdiction in the matter of fixing rates for public utility companies, presents a question of state law only, this court having taken jurisdiction upon the federal question involved, there would seem to be no question that we may, if it is necessary or desirable, determine any questions of state law which may be presented. Siler v. L. & N. R. R. Co., 213 U. S. 175, 29 S. Ct. 451, 53 L. Ed. 753; L. & N. R. R. Co. v. Garrett, 231 U. S. 298, 34 S. Ct. 48, 58 L. Ed. 229; Greene v. Louisville Interurban R. Co., 244 U. S. 499, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88; Texas Co. v. Brown, 258 U. S. 466, 42 S. Ct. 375, 66 L. Ed. 721; Wichita R. & L. Co. v. Public Utilities Commission, 260 U. S. 48, 43 S. Ct. 51, 67 L. Ed. 124.

Among other provisions, section 14 of this act defines the powers and duties of the commission whenever a complaint is filed that rates are extortionate; section 23 confers upon the commission the power of granting or refusing the right to withdraw from business in only a portion of the commonwealth; while section 3 provides for the filing of schedules of changes of rate with the Railroad Commission, and, by necessary implication, authorizes such changes. All of these sections pertain directly to the jurisdiction, powers, and duties of the Railroad Commission of Kentucky, and refer to the subjects of such regulation only as defining the multifarious nature of the duties and powers of such Railroad Commission with reference to public utilities. The title of this act reads: "An act to repeal and reenact chapter 18 of the Acts of 1916, * * * so as to prescribe the duties and powers of the Railroad Commission with reference to * * * natural gas companies and natural gas transportation companies. * * *" This title would seem to be comprehensive, and to clearly include the matters mentioned, notwithstanding each element of jurisdiction or duty imposed is not separately mentioned. Eastern Kentucky Coal Lands Corporation v. Commonwealth, 127 Ky. 667, 106 S. W. 250, 108 S. W. 1138. The act was also apparently recognized as a valid and subsisting enactment in the case of Illinois Central R. Co. v. Railroad Commission of Kentucky (D. C.) 1 F.(2d) 805, which was a three-judge case heard before Circuit Judge Denison and District Judges Cochran and Sater. Some question might also be raised as to an estoppel against the present complainants to now raise this question, after having voluntarily invoked the jurisdiction of the commission, and being thereafter dissatisfied with the ruling of such commission.

[4, 5] Aside from these questions and, from our present inclination to hold that the act refers to but one subject, the jurisdiction of the Railroad Commission, and that such subject is sufficiently expressed in the title, it does not seem essential that we now determine this question. The companies, by the allegations of their petition, invoke the jurisdiction of this court solely upon the ground that the rates fixed deprive them of their property without due process of law. The companies are admittedly public utility corporations, and as such are subject to the usual obligations of such utilities, which may be tersely stated as the duty to serve all who apply, without discrimination, and at "a reasonable rate." In order to invoke the jurisdiction of this court as a court of equity,

the complainant must have suffered injury as to a property right, as to which injury he is without adequate remedy at law. In order to state a cause coming within the Fourteenth Amendment, it is not only necessary that the procedure provided by state enactment shall lack due process of law, but the complainant must have been deprived of his property by reason thereof.

We do not understand the language of the court in the case of Illinois Central R. Co. v. Railroad Commission of Kentucky, supra, "since the state statute does not provide for any judicial review, an order made by the commission, without any substantial evidence upon which to base it, is arbitrary, is not due process of law, and calls upon any court of competent jurisdiction to enjoin its execution," to mean more than that the commission must act upon evidence, and not arbitrarily, that the commission is the forum in which such evidence must first be introduced, and that any case, decided by a commission under a law in which no provision is made for judicial review, has reached the justiciable stage for raising the constitutional question under the Fourteenth Amendment immediately upon the issuance of the commission's order. If the rates fixed are such as to allow a reasonable return upon the fair value of the property, used and useful in the business, the company is compelled only to comply with its common-law obligations. If the return is adequate within common-law principles, there would seem to be no irreparable injury to the property rights of the company and no deprivation of property of the company without due process of law.

[6] Where the rates are reasonable, therefore, and the company is required only to perform its common-law obligation, the court would seem to be without general equity jurisdiction to enjoin, and there would seem, further, to be no violation of the federal Constitution. Certainly the mere fact that a state statute is claimed to violate the state Constitution is not ground for invoking the jurisdiction of the federal District Court, except pending a determination of the question of confiscation. The suit should proceed for the purpose of determining whether the maximum rates fixed by the commission are confiscatory, but, if found to be not confiscatory, a permanent injunction should nevertheless issue to restrain the enforcement of penalties accrued pendente lite. Oklahoma Operating Co. v. Love, 252 U. S. 331, 337, 338, 40 S. Ct. 338, 64 L. Ed. 596. If the rates are determined to be confiscatory, a permanent injunction would of course issue as to their enforcement.

## Valuation:

[7, 8] In the recent hearing of the case of Van Wert Gaslight Co. v. Public Utilities Commission (D. C.) 299 F. 670, 673, in commenting upon the recent decisions of the Supreme Court in the cases of Bluefield Co. v. Public Service Commission, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176, Southwestern Telephone Co. v. Public Service Commission, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807, and Georgia Railway & Power Co. v. Railroad Commission, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144, it was said that in all these cases the court had treated the question of valuation as the pivotal question in the determination of rates, and the language of the Supreme Court in the Bluefield Case was adopted as an authoritative statement of the present law upon the subject, viz.: "Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service are unjust, unreasonable and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment. This is so well settled by numerous decisions of this court that citation of the cases is scarcely necessary."

It was also there held that, in determining the value as of the time when the inquiry is made regarding rates, it would seem that the reproduction value at such time is the dominant element, although not the only element, for consideration. The various elements which are properly considered in arriving at the value of a public utility property have been repeatedly announced by the Supreme Court of the United States. In addition to the last three Supreme Court cases cited, see, also, Smyth v. Ames, 169 U. S. 466, 546, 547, 18 S. Ct. 418, 42 L. Ed. 819, Willcox v. Consolidated Gas Co., 212 U. S. 19, 52, 29 S. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, 48 L. R. A. (N. S.) 1134, and Ohio Utilities Co. v. Public Utilities Commission, 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656, decided March 2, 1925, This list of citations could be greatly extended, but, as has been stated, our inquiry in the present case is greatly narrowed by the points of agreement between the witness Ueblacker, for the complainants, and the witnesses Hagenah and Jirgal, for the municipalities. With the exception of the various

particulars already enumerated, these witnesses are in substantial agreement.

## Gas Acreage.

[9-11] The natural gas business presents an anomalous situation in the application of the principles of present fair valuation, at least so far as gas-producing real estate is concerned. It must be conceded that the natural gas industry has taken its place in the category of public utilities, and that, as such, its property is devoted to the public use and charged with a public trust. The company is entitled to earn only a reasonable return upon the value of its properties. Can such a company be said to own the natural gas in the ground, which it has in no sense produced, as one might produce manufactured gas, electricity, or transportation, which has intrinsic worth and value only when reduced to possession, and which is marketed in its natural state, without manufacturing process? And, if such ownership can exist, may the company place an arbitrary value upon such gas unrecovered, or capitalize the earning power created by the right to extract it, beyond the actual investment in acquiring this easement?

The location and quantity of natural gas below the surface of the earth is at best highly speculative, and when such gas is once exhausted it cannot be reproduced or replaced. Because of the exhaustible character of his product, the natural gas operator is entitled to receive through the rates charged, not only his actual expenditures of operation and depreciation charges, in the sense of such sum as will keep his plant at 100 per cent. operating efficiency, but he is also entitled to such rates as will refund to him his entire capital investment within the life of the business. When the field is finally exhausted, as it must be, the reserve for depletion, or amortization reserve, should be sufficient to repay to the investor 100 per cent. of the original investment. Not only is the natural gas itself subject to exhaustion, but large quantities of casing in the wells, pipe line in the field and elsewhere, and other plant investment, are practically lost upon the exhaustion of the field. The cost of salvaging such material would, in many instances, be more than its value. The right to this amortization or depletion reserve, or the right of the company to earn such sum as would reimburse the investor for his original capital investment at the termination of the business, is universally recognized. This is in addition to what is ordinarily denominated a charge for depreciation or deterioration by use.

So far as this factor alone is considered, it would seem quite manifest that such amortization or depletion reserve must be calculated upon the investment, and not upon the present value of the so-called acreage. The investor is entitled to reimbursement through this reserve only to the extent of his original investment, plus a reasonable earning during the period of operation. In the ordinary utility, the law contemplates an indefinite continuance of the business, and allows no earnings in excess of a reasonable return, which will ultimately return to the investor the amount of his capital investment in cash. In a natural gas utility, we must look forward definitely to the complete exhaustion of the gas supply and the termination of the business upon a future day, which is certain to come. When that day does come, the operator will have been deprived of none of his property without due process of law, if he then receives back the amount of his original investment, plus a reasonable return for the period during which it has been devoted to the public use. If the exchange value at any time is held to be the measure of the amount which may be so returned to the investor, through amortization or depletion reserve, then the operator will, at the termination of his business, receive not only a reasonable return during the life of the business and his entire investment at its termination, but in addition to these he will receive, as profit beyond what is reasonable, the unearned increment of value claimed to attach to proven territory.

It is true that the market or exchange value might, in some instances, become the actual investment value; but we are not here dealing with such a case. Conceding that, for purposes of amortization or depletion reserve, the original investment alone can be considered, it remains to be determined whether, for purposes of computing a reasonable return, from time to time, the appreciated value claimed for such acreage is to be included in the rate base. Although the present case would seem to be a peculiarly apt instance for application of the very forceful and compelling reasoning of Mr. Justice Brandeis in his concurring opinion in the case of Southwestern Telephone Co. v. Public Service Commission, 262 U. S. 276, 289, 308, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807, because of the extreme uncertainty as to values and the speculative evidence thus elicited, we feel bound by the majority opinion in that case, as well as the

unvaried decisions in other cases, to value this acreage at its present fair value, if this appears from the evidence.

It will be recalled that the complainants' witness Uebelacker arrived at his valuation of gas leases or acreage through an estimate of the gas content, which he priced at 5 cents per 1,000 cubic feet in the ground. This price he arrived at by ascertaining "the difference between the prevailing market price at which such owner or lessee can produce [procure?] the gas delivered to the field mains and the cost to such owner or lessee of producing and maintaining with his own wells an equivalent supply of gas at the same point of delivery." This average difference or profit he describes as the value of the companies' gas in the ground. The other witnesses for the complainants arrive at their valuation upon the exchange value basis. Both methods have in contemplation the value of the use, and both consist of capitalizing the earning power of the properties in arriving at their value.

The fallacy of this argument, that, because of the earning capacity and large return allowed, the property has greatly increased in value, and that such increased value should thereupon be taken as the basis for another calculation of a still larger return, would seem quite apparent. The fallacy of valuing the use upon the earning capacity, and then fixing rates upon the value thus determined, has been observed by Mr. Justice Hughes in the Minnesota Rate Cases, 230 U. S. 352, 461, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, and by Mr. Justice Brandeis in his concurring opinion in the Southwestern Telephone Co. Case, supra. See, also, the following cases, to the effect that earning power, in the sense of good will or franchise value, must be excluded from consideration in arriving at the rate base: Willcox v. Consolidated Gas Co., 212 U. S. 19, 52, 29 S. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, 48 L. R. A. (N. S.) 1134; Cedar Rapids Gaslight Co. v. Cedar Rapids, 223 U. S. 655, 669, 32 S. Ct. 389, 56 L. Ed. 594; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165, 35 S. Ct. 811, 59 L. Ed. 1244; Galveston Electric Co. v. Galveston, 258 U. S. 388, 396, 42 S. Ct. 351, 66 L. Ed. 678; Georgia Railway v. Railroad Commission, 262 U. S. 625, 632, 43 S. Ct. 680, 67 L. Ed. 1144.

The language of the Supreme Court of Appeals of West Virginia upon this question seems peculiarly apt: "However, as we interpret those cases, the 'present fair value' for rate-making purposes does not mean the market value of the property as determined by the rate of return, or as based upon earnings when the reasonableness of the return or earnings is in question. If it does, then an increase in rates would increase the market value of the property, and that would again call for further increase. This would recur again and again; rates increasing values, and increased values requiring increased rates, would follow each other, to avoid confiscation under the Constitution. This vicious pyramiding would go on and on, until the point would be reached where the public would cease patronizing the utility rather than pay the price. The net result would be that the public would always be compelled to pay 'all the traffic would bear,' and governmental regulation of the prices to be charged would be at an end. Its only function in that respect would be to prevent discrimination." City of Charleston et al. v. Public Service Commission et al., 95 W. Va. 91, 120 S. E. 398. Innumerable other authorities are cited by counsel for the municipalities to the same effect, but the situation would appear to be too clear for extended discussion.

Another objection to applying the basis adopted by Mr. Uebelacker is that it presupposes ownership by the complainants of gas in the ground prior to recovery. Practically all of this class of property is held by the complainant under gas leases which convey no interest in the real estate, but give only the right to explore for and extract natural gas. Not only are percolating waters and oil and unrecovered gas in the ground not the subject of ownership until recovered, but, if the subject of ownership, such gas is the property of the owner of the fee until recovered. Not only has such gas no value unrecovered in the ground, but such value as it might have would seem to be the property of the lessor.

There are a few cases pertaining to natural gas properties which recognize that, if a sound value of gas-producing real estate be proved, such valuation is to be taken into consideration in arriving at the rate base. City of Erie v. Public Service Commission, 278 Pa. 512, 123 A. 471, and Pennsylvania Gas Co. v. Public Service Commission, 211 App. Div. 253, 207 N. Y. S. 599, are cited. In these cases it is to be noted that a value other than that based upon earning capacity

was proved. In the present case the record is devoid of such evidence. If the theories of Mr. Uebelacker, based on the valuation of gas in the ground, and of the other witnesses, based on the exchange value of the acreage, both ultimately involving a capitalization of earning capacity, be rejected, the only remaining evidence in the case is that of book or investment value, and this is argumentatively corroborated by recent costs of securing additional or new leases. No evidence was introduced tending to show that the present leases were peculiarly advantageous to the company.

Before the property is brought into production, nominal rentals alone are charged, and these are debited to expense. After the property becomes producing, a royalty is paid based upon the quantity of gas extracted. Such leases also frequently contain numerous other provisions as to the number of wells required to be drilled, free gas to the lessor, causes for forfeiture, etc. The record discloses no evidence that, even in the proved and producing territory, leases which expire cannot be renewed upon identically the same terms, or that new leases may not be obtained upon such terms in territory as it is proved and comes into production. The conditions of rental seem to be standardized, and the terms to be considered mutually fair, the return to the lessor adequate. Under such circumstances the best, if not the only, evidence of value in the record is the investment value.

Under these circumstances we are constrained to value the complainants' leases at the book value of $6,732,920. Some value may accrue from the fact that such leases are held upon large blocks of contiguous territory, thus eliminating competitive depletion, but this value does not appear. At best it is to be included in a "going concern" value, as it consists of that appreciation which comes from the use of several properties in conjunction with each other, thus creating a value in excess of the mere aggregate of the values of the several items. So far as acreage is concerned, this value, as such, does not appear from the evidence.

### Interest on Capital During Construction.

[12-14] In valuing the plant for purposes of arriving at the rate base, a charge for interest upon capital during construction is proper. Ohio Utilities Co. v. Public Utilities Commission, supra. It is also true that in some natural gas projects the highly speculative nature of the investment would necessitate high interest rates. But in determining what rate of interest should be applied in any specific case the nature of the business involved must be considered. Here the element of speculation is reduced to a minimum. The properties are proved and producing, and were so when the company was organized. The markets are established. The company is the subsidiary of two other large, substantial, successful corporations. There are not, and never were, any of the elements of the speculative, "wildcat" venture. We are of the opinion that the 7 per cent. interest rate conceded by the witness Hagenah, for the protesting municipalities, is sufficient, even generous.

### Cost of Financing.

[15, 16] It is common knowledge that when a large public utility desires to market its securities, it usually secures the services of an underwriting syndicate. Such syndicate underwrites the bonds or stocks at a definite figure, and the company is not thereafter concerned with the market price at which they are sold. The underwriting may prove highly profitable to the underwriters, as where the securities are sold at prices considerably above the underwriting price. The underwriting may prove unprofitable, as in cases where the securities cannot be marketed to the public, except at less than the syndicate price. In either event it is only when the securities are sold to the syndicate at a discount that it is necessary for the issuer to charge of anything to cost of financing or to amortize "bond discount," and, when securities are sold at a discount, such discount is no less a portion of the cost of procuring funds than is a higher rate of interest, which would enable the company to sell the securities at a premium. In both cases the expenses of the syndicate are absorbed by the spread between the syndicate and the market prices.

[17] It is equally common knowledge that large operating corporations and those usually employed as syndicate managers maintain at their own expense elaborate engineering, estimating, valuing, and advisory departments. It is by these departments that the work included in complainants' "Cost of Financing" is done. This work is paid through the "spread" above noticed, and is fundamentally part of the price paid for the use of funds. It is interest, rather than brokerage, as far as the company's viewpoint

is concerned. It may appear as brokerage, or discount, upon the books, or it may not appear at all.

A charge for "cost of financing" is so indefinite—so possible to occur or not occur in the establishment of a business enterprise—and so close to the border line that we are disposed to allow it, but only as a part of the "going concern" value to be now discussed.

### Going Concern Value.

[18] The expert called for the protesting municipalities has conceded the propriety of including an item of $3,000,000 as "going concern" value in arriving at the present fair value of the complainants' properties. Although not contested, we are not able to join whole-heartedly in this concession. There are cases in which the plant as an entirety has a value greater than the value of the component parts, but such value is difficult of computation, most uncertain in amount, and generally is the outgrowth of the expenses incident to assembling in one unit all the various parts which go to make up the whole. These expenses have received consideration in estimating overhead expenses during and prior to construction. So also, the items of property have been valued as integral parts of the new operating whole, and as already charged with the attendant values as such, as well as with construction overheads. In addition to this, general overhead charges of every conceivable kind have been included. Thus, as *direct or construction overheads* added to the labor proportion of unit costs in valuation we find insurance, loss and use of tools, field supervision, time-keeping, and contingencies, and as part of the overhead, added to cost of material, purchasing, warehousing, and contingencies. In addition to these, we find other *general overheads* added for engineering and superintendence, administration, interest, preconstruction costs, legal expenses, insurance and taxes, and cost of financing.

It is extremely difficult to conceive of any other elements which might go into the property to increase its value as an entirety over the aggregate of component parts, and we must not, in the name of going concern value, sanction the inclusion of mere good will as predicated upon earning capacity. This position is well expressed by the Supreme Court of Iowa in Cedar Rapids Gas Co. v. Cedar Rapids, 144 Iowa, 426, 120 N. W. 966, 48 L. R. A. (N. S.) 1025, 138 Am. St. Rep. 299, 223 U. S. 655, 32 S. Ct. 389, 56 L. Ed. 594: " * * * As previously intimated, the value of the plant is to be estimated in its entirety, rather than by the addition of estimates on its component parts, though the latter course will materially aid in determining the value. * * * Save as above indicated, the element of value designated a 'going concern' is but another name for 'good will,' which is not to be taken into account in a case like this. * * * " This language was cited with approval in Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 169, 35 S. Ct. 811, 59 L. Ed. 1244, in which the Supreme Court approved the disallowance of a "going concern" value.

The evidence does not satisfactorily distinguish between the going concern value claimed and good will, and in so far as we admit such item in the valuation we are of the opinion that it must be held to include all the disputed overhead charges. Certainly we could not include a going concern value in excess of the $3,000,000 conceded. Mr. Uebelacker originally included no allowance whatever for this item, and his estimate of a going concern value of $8,423,111 is wholly without reason or evidential support.

### Method of Computing Deterioration.

[19, 20] While it seems to us reasonably clear that depletion must be calculated by the straight-line, age-life, method, and upon the investment value which is to be returned in full, yet when it comes to estimating depreciation of physical plant in the sense of deterioration from use, we feel just as strongly that the method of "observed deterioration" is to be applied in arriving at the rate base. When we are considering valuation alone, this eliminates the determination of what annual charge may be made for such deterioration. This is to be included in the reasonable rate permitted, and will be considered below. Suffice it here to say that, our ultimate purpose being to find the present value of the physical plant as an operating entity, reliable evidence of such value, as the plant now is, is to be preferred to theoretical opinions as to what its condition should be, in view of its age and previous use. Pacific Gas & Elec. Co. v. San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075.

Summarizing the foregoing conclusions, we would arrive at the following valuation of the combined properties of the United Fuel Gas Company and the Warfield Natural Gas Company:

| | |
|---|---|
| Natural gas leases, book value.. | $ 6,732,920.00 |
| Production, physical plant..... | 7,830,400.00 |
| Transmission ................. | 11,154,526.00 |
| Distribution ................. | 2,694,806.00 |
| General property ............. | 594,742.00 |
| Total .................... | $29,007,394.00 |
| Overheads, 18 per cent. upon depreciable physical plant...... | 4,009,370.00 |
| Working capital .............. | 999,000.00 |
| Going concern value ......... | 3,000,000.00 |
| | $37,015,764.00 |

### Apportionment of Rate Base and Operating Expenses to Various Localities.

In the instant case we are concerned primarily with whether the rates fixed for Ashland, Catlettsburg, and Louisa, Ky., are such as afford a reasonable return upon that portion of the complainants' total properties as is devoted to the public service rendered in these several municipalities. We are not concerned primarily with whether the return of the company from its entire business is reasonable. However, it may be noted argumentatively that the entire return was held to be reasonable by the Public Service Commission of West Virginia, in case No. 1516, decided March 24, 1925, and pertaining to rates of complainants' consumers within the state of West Virginia. It is also interesting to note that in this hearing the Public Service Commission of West Virginia arrived at a total valuation of the complainants' properties of $35,999,969.14. This valuation approximates very closely the valuation we have placed upon the properties in the instant case, although we arrived at our conclusion in a somewhat different manner.

[21-23] It therefore now becomes necessary that the determined rate base and the operating expenses be apportioned to the localities with which we are particularly concerned. We are of the opinion that production expenses and valuation, general property valuation, general expenses, and working capital should be apportioned on the proportionate sales basis, transmission, system valuation, and expenses upon the demand mileage basis, and distribution upon actual valuation of the distribution plants in the several municipalities and actual expenses there incurred. Overhead expenses may be figured at 18 per cent. of the total valuation of physical plant allocated to the particular municipality, and going concern value at approximately 10 per cent. of such physical plant valuation so allocated.

### Sales to Parent Companies.

By so allocating the plant valuation and expense of operation, and by restricting our inquiry to whether the rates for the particular municipalities afford opportunity for reasonable return on such valuation, the question as to what adjustment should be made by reason of sales to the parent companies at less than industrial or commercial rates is eliminated.

### Application of Gasoline Earnings.

[24] Very shortly after the reorganization of the United Fuel Gas Company, it developed that gasoline could be profitably extracted from the natural gas without too serious impairment of its heating qualities. For some years the United Fuel Gas Company conducted this enterprise of gasoline extraction as a department of its natural gas business. So conducted, gasoline would seem to constitute a by-product of the natural gas business, as clearly as coke, tar, and ammonia are by-products of manufactured gas. The business proved to be highly successful, and for the years 1919, 1920, 1921, 1922, and 1923 the net earnings from the extraction and sale of gasoline averaged in excess of $2,000,000 per year, and yielded in excess of 200 per cent. profit on the investment in such gasoline extraction department. Here again the company sought, by creation of a subsidiary instrumentality, to improve its "technical position" with reference to the gas consumer, and the Virginia Gasoline & Oil Company was organized. The capital stock of this company was not retained by the United Fuel Gas Company, but was transferred to and is owned by "the stockholders of the United Fuel Gas Company," which stockholders are two in number, namely, the Columbia Gas & Electric Company and the Ohio Fuel Supply Company. It is to be assumed from the evidence that the stock of the gasoline subsidiary is held in the same respective proportions, viz. 51 per cent. and 49 per cent., as is the stock of the United Fuel Gas Company. The entire beneficial interest, therefore, is in the same ultimate companies that hold the beneficial interest in the United Fuel Gas Company, and in the same identical proportions.

It is contended by the United Fuel Gas Company that this enterprise of extracting gasoline from natural gas is separate and distinct from that of the public utility, and that, this branch of the business not being impressed with the public trust, the earnings therefrom should not be taken into consideration in estimating the reasonable rate. In one of its earlier rulings the Supreme Court of Appeals of West Virginia held that the gasoline extraction privilege was

so integral a part of the business as to justify crediting to the natural gas business one-half of the net earnings. These net earnings have fallen off during the last year or 18 months. Thus during the year ending October 31, 1924, the net earnings from gasoline extraction amounted to $1,214,685.60, and for the calendar year 1924 slightly in excess of $1,000,000. The evidence also affords some intimation of approximate value of this privilege. In a contract between the United Fuel Gas Company, the Columbia Gas & Electric Company, and the Ohio Fuel Supply Company it is provided, in substance, that 3 cents per 1,000 cubic feet of gas treated shall represent the reasonable value of such privilege. There is also in evidence the affidavit of one witness to the effect that this privilege is worth at least 2½ cents per 1,000 cubic feet of gas.

Viewing the gasoline as a pure by-product of the natural gas business, we are of the opinion that earnings should be increased, or operating expenses decreased, by some fair apportionment of the earnings from this branch of the business. Considering the greatly increased and increasing production of gasoline from natural gas since 1917, it is to be assumed that the earnings from this source have not permanently decreased in volume, but that the results of the years 1923 and 1924 are more or less temporary depressions in earning power. We are of the opinion that the application of one-half of the net earnings to the gas business is in no wise unreasonable, since this will also afford a most generous return on the value of the property used for extraction purposes. In previous years this would amount to not less than 2 cents per 1,000 cubic feet of gas treated, and even in the year of 1924 would exceed 1 cent per 1,000 cubic feet of gas so treated. To this extent the costs of the production are decreased, or the return from such production increased.

Depletion, Depreciation, and Maintenance.

[25, 26] Attention has already been called to the fact that there is a marked distinction between depletion, in the sense of the exhaustion of supply, and depreciation, in the sense of deterioration of equipment from age and use. We have pointed out that a depletion charge, in estimating the reasonable rate, must be figured upon the investment value, and over the entire estimated life of the properties. It must be such that, upon the exhaustion of the properties, the operator will have received his entire investment, plus a reasonable return upon such investment, during the dedication of it to public use.

Annual depreciation must also be considered in arriving at the rate. Such depreciation consists of the sum of money which will be sufficient to keep the property at 100 per cent. operating efficiency. Allowance must not only be made for current repairs, but such additional sum must be included as will create a reserve from which equipment may be replaced at the termination of its operating life. This depreciation, having in view the replacement of equipment as it wears out or is consumed, must be figured upon the appraised value rather than investment cost.

[27] The evidence does not clearly disclose what salvage there will be from production, transmission, and distribution systems at the termination of the life of the field. It is to be assumed that the distribution systems will, at least in large part, be available for manufactured gas distribution, and the transmission or transportation systems may possibly be used in connection with manufactured gas or the development of other fields. Whatever proportion of the value of these several systems it may be impossible to salvage at the termination of the business should properly then have been returned to the investor in the form of dividends in excess of reasonable return. The rate should be sufficient to allow, not only the creation of this reserve for depletion, but also annual depreciation, maintenance, and repair charges. We are of the opinion that the 6 per cent. annual charge upon the entire property or rate base, as claimed by the complainants, is sufficient to provide for both depletion and depreciation as above defined.

The company has been in operation for approximately 15 years, and the estimated future life of the field is conceded to be about 18 years. At the expiration of this period the company will have been in operation approximately 33 years. Bearing in mind that this amortization or depletion reserve is to be calculated upon investment value and over the entire life of the property, it is reasonable to assume that 3½ per cent. of the depreciable and depletable rate base will be amply sufficient to provide for this purpose; 1½ per cent. of the rate base would likewise seem adequate to meet charges for depreciation, repair and replacement. This creates a surplus allowance of 1 per cent. which makes the gross allowance seem ample. This conclusion is confirmed by the analyses of the adjusted net earnings during

the last 10 years. From these it would appear that something in excess of $14,000,000 had already been amortized, or at least one-half of the present value, less working capital and salvage reasonably to be expected. This sum the stockholders have already received by way of dividends and created surplus.

#### Reasonable Rate.

[28] It is urged by the company that the rate should be made up of at least 10 per cent. representing interest upon investment and profits, and 6 per cent. to cover depreciation and depletion. While we are of the opinion that 5 per cent. in this particular case will amply cover depreciation and depletion, and that 10 per cent. profit is perhaps high, the contention of the complainants may here be conceded, without varying the result at which we have arrived. Likewise, in the instant case, it would seem to be immaterial whether producing and reserve acreage of the company be included in the rate base at its exchange value, or at the investment value, which we have found to be the only value proved. Upon the first hypothesis the company is placing itself in the category of other public utilities, with an indefinitely continuing life. As such it would be entitled to a reasonable return, without right to amortization and depletion reserve as to such acreage and unreclaimable plant. A 9 per cent. return upon the appreciated valuation claimed, of $66,000,000, which we assume to be ample, would closely approximate 16 per cent. return upon the rate base here found.

[29] Upon either valuation, with its applicable rate of return, the question to be determined is whether the rates fixed for service in the municipalities in question has been shown by the evidence to be confiscatory, conceding, without determining, that the return claimed by the company is reasonable. The court is not to fix the rate, but solely to determine whether the rate fixed is confiscatory. This we are constrained to hold does not appear from the evidence.

#### Determination of the Rates Here Fixed.

[30] Before considering this question in detail, it is necessary to first determine the properly enforceable rates as fixed by the order of the Railroad Commission of Kentucky on December 11, 1923. It would seem that the matter of what discount should be allowed to insure prompt payment of bills is peculiarly a matter within the discretion of the company. The commission has made no order as to the length of the discount period, and the company presumably would be justified in making it as short as it pleased. Such action on the part of the company would demonstrate the futility of the commission providing as to discounts, and would emphasize the fact that the amount of discount, or the length of the discount period, is primarily a matter of internal management, with which the commission is not directly concerned. The function of the commission, as well as the function of courts of equity and common law in enforcing public utility obligations, would seem to be to fix a maximum, and not a minimum, charge. It is possible, or even probable, that the mere threat of discontinuing service if bills are not paid within a specified period (as in the operation of telephone utilities) would be sufficient to ensure prompt payment. What allowance the company will make for prompt payment should be universally applied, so as not to create discrimination; but a rate which is less than the maximum which the company could charge to the dilatory consumer would not seem to be exorbitant. The function of the commission is to provide against extortionate charges as to any and all consumers, whether prompt or dilatory in payment, and the commission is not concerned with questions of internal management beyond this point.

We are therefore of the opinion that the proper construction of the order of the commission of January 18, 1922, was that adopted by the company and acquiesced in by the commission. There would seem to be no ground for ordering refund of the difference between 31 cents and 28 cents, as was done in the order of the commission of December 11, 1923; nor are we of the opinion that such order of the commission is valid to the extent that it proposes to fix the amount of discount, and thus usurp the decision of purely discretionary questions of internal management. To this extent the order of the commission should be enjoined, and the rate fixed by such order should be considered as a 32-cent rate, with such discount as the company may hereafter see fit to fix.

To this return of 32 cents must be added not less than 1 cent per 1,000 cubic feet for gasoline extraction privilege, and, if the years prior to 1924 are considered, this addition should be placed at 2 cents per 1,000 cubic feet. The question then resolves itself into whether, allocating to the municipalities the proportion of the rate base

adopted which is properly to be considered as devoted to the public use in such municipalities, and expenses as heretofore indicated as proper, gas sold at this rate of 33 cents, or 32 cents, if the gasoline earnings be deducted from production expenses, will yield a reasonable return to the company; or, perhaps better expressed, the question is whether the evidence discloses that these rates result in confiscation of complainants' property.

[31, 32] The burden of showing such confiscation rests upon complainants. The evidence of confiscation must be clear, before the court would be justified in holding the action of the commission to be unconstitutional. The rate will not be set aside unless the evidence compels conviction that a fair-minded board would not have reached the conclusion that the rate would not prove adequate. The initial presumption is in favor of adequacy and this presumption must be clearly overthrown by evidence before a permanent injunction will issue. See San Diego Land & Town Co. v. National City, 174 U. S. 739, 754, 19 S. Ct. 804, 43 L. Ed. 1154; San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 442, 23 S. Ct. 571, 47 L. Ed. 892; Knoxville v. Knoxville Water Co., 212 U. S. 1, 17, 29 S. Ct. 148, 53 L. Ed. 371; Van Dyke v. Geary, 244 U. S. 39, 49, 37 S. Ct. 483, 61 L. Ed. 973; Galveston Electric Co. v. Galveston, 258 U. S. 388, 401, 402, 42 S. Ct. 351, 66 L. Ed. 678.

Judged by this criterion, we are clearly of the opinion that the evidence fails to show a return of less than 16 per cent. upon the rate base fixed. By way of illustration, the court, at the time of the hearing of the application for interlocutory injunction, applied the method of computing return which was adopted by the complainants' witness Hightower (Exhibit No. 10, second commission hearing) to a rate base of $36,000,000. The period covered was for the year ending June 30, 1923, during which the company was charging 31 cents per net 1,000 cubic feet of gas, or a gross rate of 32 cents, less 1 cent discount. The result of this application, as to Ashland and Catlettsburg combined, was as follows:

### Investment.

| | |
|---|---|
| Production, peak | $2,238,269.00 |
| Transmission, peak | 428,326.00 |
| General, peak | 9,251.00 |
| Distribution, actual | 242,640.00 |
| Incomplete construction, peak | 35,574.00 |
| Total investment allocated | $2,954,060.00 |

| | |
|---|---|
| Operating revenue | 918,723.00 |
| Operating expense allocated | 284,769.00 |
| Gross earnings | 633,953.00 |

Return before depletion and depreciation, 21%.

Reference might also be made to Jirgal's Exhibit No. 2 for the year ending December 31, 1923. If the rate base be increased from that used by Mr. Jirgal to the $37,000,000 here adopted, and depletion and depreciation be fixed at 5 per cent. we have for the territory there covered:

| | |
|---|---|
| Investment | $3,275,850.00 |
| Earnings | 749,839.00 |
| Depreciation and depletion | 163,792.00 |
| Net earnings | 586,047.00 |

—or a net return of 17.7 per cent. after allowance of depletion and depreciation of 5 per cent. If the rate be figured on the basis of Wyer Exhibit "Wyer A" (interlocutory injunction hearing), allowing 16 per cent. return on the rate base of $36,000,000, plus, we would arrive at the following:

| | |
|---|---|
| 16 per cent. return on production, calculated at 72.5 per cent. of base | $4,176,000.00 |
| Return on transportation, 21.5 per cent. of base | 1,334,400.00 |
| Return on distribution, 6 per cent. of base | 345,600.00 |
| 16 per cent. return upon entire investment | 5,856,000.00 |

If the 1922 operating figures be applied, and production cost distributed over 45,000,000 M cubic feet, the production expense and return combined would equal 13½ cents per 1,000 feet of gas. If transportation cost be distributed over 44,000,000 M cubic feet, it would equal 3½ cents per 1,000. Distribution cost distributed among domestic consumers only, or over 6,000,000 M cubic feet, would equal 11 cents. The summary of cost of production, delivered, including a 16 per cent. return, would be as follows:

| | | |
|---|---|---|
| Production cost | 13½ | cents |
| Transportation cost | 3½ | " |
| Distribution cost | 11 | " |
| Total | 28 | " |

This computation includes 16 per cent. return, and does not include gasoline earnings. There is an additional margin of profit of a minimum of 4 cents per 1,000 cubic feet over the return of 16 per cent.

If time permitted, the illustrations could be indefinitely multiplied of recalculating the cost of gas or the percentage of net return upon a rate base of $37,000,000, in accordance with the methods pursued by the

various auditors. Suffice it to say that the evidence introduced, not only does not show confiscation, if the rate base be fixed at $37,000,000, but in our opinion affirmatively shows that upon such rate base the earning is at least 16 per cent. upon the property properly allocated to the municipalities here protestants.

### Right to Withdraw from Business in the Cities.

[33-35] One of the recognized duties of the public utility being to serve all who apply, such companies are not only subject to legislative regulation in this respect. N. & W. R. Co. v. Public Service Commission of West Virginia, 265 U. S. 70, 74, 44 S. Ct. 439, 68 L. Ed. 904. But this common-law duty can be enforced by a court of equity. Having assumed jurisdiction in the instant case, the court will retain jurisdiction to insure the doing of complete justice as between both parties. It is, perhaps, not disputed that, if the company wished to withdraw from business in the entire state, it would be justified in so doing. This, after a fashion, the United Fuel Gas Company has attempted to do, but in creating the Warfield Natural Gas Company, of which it owns the entire capital stock, it has but created an instrumentality for the continuance of its business, and neither company contemplates the abandonment of all its business in Kentucky.

[36, 37] A court of equity will look through the mere fiction of corporate entity to the fact that the United Fuel Gas Company is now, as heretofore, doing business in the state, and is enjoying the privileges of a public utility in Kentucky, among which is the right of eminent domain, and the right to occupy, cross, and use the public highways in various portions of the commonwealth. The mere fact that the franchises in the various cities have expired does not make the continuance of this business illegal, for, under section 23 of the Railroad Commission Act, the enterprise is now to be considered a state venture, and not a municipal one. The state is the unit, and not the municipality. There is no obligation to continue in the state, but, if they do continue in the state, they are subject to their common-law and statutory duties in all parts of the state —county, township, and municipal. This would not only seem to be the result of recent legislation, but also to be the trend of judicial view in Kentucky and elsewhere. See Southern Railway Company in Kentucky v. Hatchett, 174 Ky. 463, 192 S. W.

694, L. R. A. 1917D, 1105; North Carolina Public Service Co. et al. v. Southern Power Co. (C. C. A.) 282 F. 837, 844, 33 A. L. R. 626; Missouri Pacific Ry. Co. v. Kansas, 216 U. S. 262, 277, 30 S. Ct. 330, 54 L. Ed. 472; and Pennsylvania v. West Virginia, 262 U. S. 553, 43 S. Ct. 658, 67 L. Ed. 1117, 32 A. L. R. 300; also, N. Y. ex rel. Gas Co. v. McCall, 245 U. S. 345, 38 S. Ct. 122, 62 L. Ed. 337.

[38] The cases cited to the contrary are those in which the company, by withdrawing from the municipality, likewise withdrew from the entire state. The mere fact that the public service duty requires perhaps the expenditure of capital for supplying suitable facilities reasonably necessary for the performance of the obligation does not constitute taking of property without due process of law. See N. & W. Ry. Co. v. Public Service Commission, supra.

To hold otherwise than above might be compared to the case of an unsatisfactory rate for carriage by railway of any specific commodity, say, coal, and the announcement by the railway that it would withdraw from the business of receiving coal for transportation, and would haul no coal at the rate fixed, nor at any rate, until the rate proposed by it was authorized. Clearly a utility cannot abandon part of its business, because the rate is not entirely satisfactory, while operating as to the remainder.

### Final Conclusion.

From what has been said, the conclusion is inevitable that, if the rate base be fixed at $37,015,564 (the base adopted), and the rate sought to be enjoined be considered as 32 cents per 1,000 cubic feet, less such discount as the company may determine, the complainants have failed to sustain the burden which rests upon them of showing that such rate is confiscatory. Similarly, if the rate base be considered as appreciated by reason of the appraisement of the gas leases or acreage, and the rate of return reduced from 16 per cent. plus, to that considered amply reasonable in the case of the ordinary utility, say 8 or 9 per cent., the complainants have likewise failed to show confiscation.

The injunction will be made permanent as to the enforcement of any penalties accrued pendente lite, and as to the enforcement of that provision of the order of December 11, 1923, fixing the measure of discount, and authorizing recovery of any differences between 31 cents and 28 cents net

rate. As to the balance, injunction will be dissolved. It is ordered that each party pay their own costs, as there was reasonable ground in part only for the application to this court.

Counsel should agree upon the order to be entered herein, so that the same may be placed of record prior to May 13, 1925.